**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **JUSTIN C. CANDELA,** ) | **CASE NO. 1:10-CV-1603** |
| ) | |
| Plaintiff, ) | |
| ) | **MAGISTRATE JUDGE GREG WHITE** |
| v. ) | |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| Defendant. ) | **MEMORANDUM OPINION & ORDER** |

Plaintiff, Justin C. Candela ("Candela"), challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Candela's claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 1381 *et seq*. This matter is before the Court pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is vacated and this case is remanded for further proceedings consistent with this opinion.

## I. Procedural History

On December 14, 2005, Candela filed an application for SSI alleging a disability onset date of December 5, 2005, claiming he was disabled due to mental illness. (Tr. 114.) His application was denied both initially and upon reconsideration. Candela timely requested an administrative hearing.

On October 8, 2008, an Administrative Law Judge ("ALJ") held a hearing during which Candela, represented by counsel, testified. Barbara Byers, an impartial Vocational Expert ("VE") also testified. On October 31, 2008, the ALJ found Candela was able to perform a significant number of jobs in the national economy and, therefore, was not disabled. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied

further review.

## II. Evidence

*Personal and Vocational Evidence*

Age 26 at the time of his administrative hearing, Candela is a "younger" person under social security regulations. (Tr. 21.) *See* 20 C.F.R. § 416.963. Candela has a high school education and past relevant work history as a machine packager. (Tr. 20, 21.)

*Medical Evidence*

On December 14, 2005, James Cozy, M.A., psychologist, evaluated Candela and completed an Ohio Department of Job and Family Services Mental Functioning Capacity Assessment finding that he was moderately limited in his ability to:

- understand and remember very short and simple instructions;
- understand and remember detailed instructions;
- maintain attention and concentration for extended periods;
- work in coordination with or proximity to others without being distracted by them;
- complete a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods;
- interact appropriately with the general public;
- get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and,
- travel in unfamiliar places or using public transportation.

(Tr. 264.) Cozy indicated that Candela presented with calm, cooperative behavior, and did "not present any mental health difficulties that would cause problems in employment." (Tr. 265.)

On January 30, 2006, Richard Halas, M.A., a consultative psychologist, evaluated Candela's mental condition and intellectual functioning. (Tr. 273-282.) Halas noted that Candela was timely and oriented during the interview (Tr. 274-275), but his grooming was below average. (Tr. 273.) He was restless and impulsive. *Id*. He did not have problems with hallucinations, delusions, paranoid ideas, psychosis, or thought disorders. (Tr. 274.) Candela was able to do simple calculations, but was unable to perform serial seven subtraction. (Tr. 275.) His long-term memory was intact, and he was able to provide a detailed history. *Id*. His short-term memory was also intact, with a recall of three out of three items in five minutes. *Id*. He was unable to concentrate and recall more than four digits forward. *Id*. He did not understand simple proverbs and his general intelligence level was estimated in the borderline range. *Id*.

Halas noted that Candela graduated from Harbor Senior High School, and had been home-schooled. *Id.* Prior to his home-schooling, he had been in special education classes. *Id.* He maintained average grades, and had not been held back. *Id.* His overall physical health was good, and he has not taken any medication on a regular basis. *Id.* Other than being evaluated through the school psychological services, he had not been treated for psychological problems. *Id.* Candela briefly worked for several different employers. *Id.* He reported that he spent his days watching television, sharing household chores with his mother, and playing games or chatting on the computer. (Tr. 276.)

Intelligence testing showed borderline ranges of intellectual functioning, with a full scale intelligence quotient ("IQ") of 74, verbal IQ of 78, and performance IQ of 74. (Tr. 276, 279.) He had average vocabulary and math skills, and below average common sense judgment. (Tr. 276.) The psychologist concluded that current testing showed below average intellectual levels, and borderline intellectual functioning. (Tr. 277.) Candela was assessed with significant psychological or emotional problems that were likely to interfere with his ability to maintain emotional stability and act appropriately in work and social settings. (Tr. 277-278.) Halas further noted that Candela was highly dependent upon his parents, immature, and unable to control his frustrations. (Tr. 278.) He diagnosed attention deficit hyperactivity disorder, a mixed personality disorder, and borderline intellectual functioning. *Id.*

In March, 2006, Halas again evaluated Candela's psychological condition, this time assessing Candela's work-related abilities. (Tr. 283-291.) The doctor found Candela has moderate limitations in his ability to relate to others, to follow through with simple, one and two-step instructions or directions, and to maintain attention to perform simple repetitive tasks. (Tr. 288.) He found Candela had a marked limitation in his ability to withstand stresses and pressures associated with most day-to-day work activities. *Id.*

Also in March, 2006, John Waddell, Ph.D., a state agency psychologist, reviewed Candela's medical record and assessed his functioning. (Tr. 292-309.) Dr. Waddell reported Candela's functioning as follows: a mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration,

3

persistence, and pace, and no episodes of decompensation. (Tr. 302.) The doctor indicated that Candela was not significantly limited in most areas of mental functioning, including his abilities to understand, remember, and carry out short and simple instructions. (Tr. 306-307.) Dr. Waddell indicated moderate limitations in understanding, remembering, and carrying out detailed instructions, maintaining attention and concentration for prolonged periods, working in coordination with others, completing a normal work day or week, responding appropriately to criticism and workplace changes, and setting goals. (Tr. 307.) Dr. Waddell concluded that Candela would do best in a highly structured environment with simple, repetitive tasks. (Tr. 308.) Dr. Waddell also concluded that Candela did not meet or equal any mental impairment listing. (Tr. 292.) The doctor incorporated this conclusion when completing Form SSA-831-U5. (Tr. 55.)

In August, 2006, Douglas Pawlarczyk, Ph.D., a state agency psychologist, affirmed Dr. Waddell's assessment. (Tr. 310-311.) In January, 2007, Dr. Pawlarczyk also completed a Form SSA-831-U5, concluding that Candela did not meet or equal the criteria of any listings. (Tr. 56.)

Candela treated with Khoa Tran, M.D., a psychiatrist, from December, 2006, through May, 2007. (Tr. 312-327.) At the first visit in December, 2006, Dr. Tran's nurse conducted a mental health assessment. (Doc. No. 327.) She reported that she was unable to get much information as Candela laughed and smiled in response to questions. He also asked for his mother to be present. (Doc. No. 327.) The nurse noted that Candela became angry quickly, using profanity, although his mother was able to calm him down. *Id*. He left the office twice during the evaluation, and stated that his mother was pushing him to come to the appointment. *Id*. Candela further stated that all he wanted was a normal job and life, but that his mother wanted him to be on Social Security disability. *Id*.

In January, 2007, Candela presented to Dr. Tran with the chief complaint of racing thoughts. Candela indicated that unless he was provoked, he had no significant agitation or irritability. (Tr. 324.) He denied anxiety from panic symptoms, depression, low mood, hopelessness, suicidal thoughts, or psychotic symptoms. *Id*. Candela did report sometimes becoming hyperactive. *Id.* He kept to himself as much as he could. *Id*. When he worked as a

4

mechanic, he was able to focus at times. *Id*. He stated that he was willing to work and liked to work hard. *Id.* He wanted to find a job and do something with his life, instead of being at home. *Id*. Dr. Tran reported that his mental status examination showed he was cooperative and exhibited normal speech, but presented with poor hygiene and grooming. *Id*. His affect was mildly irritable, but very calm at times. *Id*. His thought process was linear and coherent. (Tr. 324-325.) Candela denied active suicidal or homicidal thoughts, delusions, paranoia or psychosis. (Tr. 325.) His cognition was intact. *Id*. Dr. Tran diagnosed a mood disorder NOS, ruling out attention deficit, and prescribed Strattera. *Id.* He noted that he did not see any bipolar disorder or depression. *Id*. Dr. Tran referred Candela to a therapist for possible anger management. (Tr. 326.)

At a February, 2007, appointment, Candela reported to Dr. Tran that the medication seemed to slow his thoughts down and was helping his concentration. (Tr. 321.) Candela also reported that he was able to function, but had continuing problems at home with his brother. *Id*. Otherwise, he reported no agitation or irritability. *Id*. Dr. Tran noted that Candela was alert, calm, and cooperative. *Id.* He further indicated that Candela's thought process was logical, linear, and coherent. *Id*. Candela denied any suicidal or homicidal thoughts, delusions, paranoia, or psychosis. *Id*. His affect was calm and appropriate, and his cognition was fair. *Id*. Dr. Tran diagnosed attention deficit disorder and continued to prescribe Strattera.

In March, 2007, Candela reported to Dr. Tran that he was doing "pretty fair." (Tr. 317.) Candela reported no significant agitation or irritability and no sleep or other problems. *Id*. He also reported that he was not taking his medication regularly, but when he took the medication, it helped. *Id*. Dr. Tran's diagnosis was adult attention deficit disorder and again prescribed Strattera. *Id*.

In May, 2007, Candela complained to Dr. Tran that Strattera was making him disoriented. (Tr. 315.) Candela reported that he had stopped taking the medication for about a week, and had some decrease in concentration and focus. *Id*. Dr. Tran reported that Candela's affect appeared calm and appropriate, and his cognition was intact. *Id*. Dr. Tran again diagnosed adult attention deficit disorder and prescribed Adderall. *Id.*

5

*Hearing Testimony*

At the hearing, Candela testified to the following:

- He lives in an apartment with his mother and her boyfriend. (Tr. 28, 29.)

- He has a driver's license. (Tr. 34.)

- He was home schooled from approximately the third or fourth grade. (Tr. 38.) Other students were not present and classes were conducted at his house. *Id.*[1]

- He worked at Ashtabula Star Beacon on a conveyor line, making sure the newspapers were straight when banded. (Tr. 29.) He worked three months, but was fired because he could not get along with co-workers (Tr. 30) and could not keep up with the work. (Tr. 42.)

- He has no income, but receives food stamps. (Tr. 32.)

- He helps his mother with chores around the apartment; he tries not to watch television; and he spends his days playing a medieval-type game called Roomscape [RuneScape] on the computer, approximately three to five hours per day. (Tr. 32-33.)

- There is not much reading in RuneScape, but he has to plan and reason. (Tr. 35.) The skills involved in the game are woodcutting, fletching, magic, and herbilore (making potions) by pressing keyboard buttons. (Tr. 36.) There can be between 28 or 29,000 people playing the game online, and they talk to each other by typing. (Tr. 37.)

- When playing RuneScape, he gets distracted approximately every 45 minutes to an hour and takes a 10-15 minute break. (Tr. 39-40.)

- He socializes with friends and other people by visiting with them at their homes. (Tr. 34.)

- He had difficulty getting along with his peers at his previous job, and also with his classmates in school. (Tr. 31.)

- He was distracted at his jobs by people talking behind his back. (Tr. 40.) His nerves would build up and he just wanted to fly off the handle. *Id.*

- He has trouble getting along with his oldest brother and his mother's boyfriend. (Tr. 41.)

- He does not have trouble getting along with his father. *Id.*

---

[1] Candela also testified that he completed high school, but was in special education classes. (Tr. 29.)

6

After the VE described Candela's past relevant work as a machine packager to be unskilled work at the medium level, the ALJ posed the following hypothetical to the VE:

> Assume that I would fin[d] that Mr. Candela, or the hypothetical individual, would not experience any physical limitations that will let him engage in work activity up to the, at least to the heavy level. However, this individual is limited to low stress simple repetitive type tasks with no frequent interaction with coworkers or the general public. Considering Mr. Candela's age, education, and work experience, are there jobs he can perform?

(Tr. 43.)

The VE testified that such an individual could work in the following unskilled positions: laundry laborer at the medium level (580,000 positions in the national economy; 20,000 in Ohio); dishwasher (500,000 nationally, 18,000 in Ohio); stock clerk job (524,000 nationally, 5,000 in Ohio). The VE further testified that these jobs are simple, routine, repetitive positions and do not require frequent interaction with coworkers or the public. (Tr. 46.) The ALJ clarified that his meaning of interaction involves a position in which employees, in order to accomplish the duties of the job, are required to engage in conversation and otherwise interact with coworkers. (Tr. 48-49.) The VE indicated that none of the jobs he described necessitated interaction with others in order to perform the job. (Tr. 49.)

Candela's attorney next inquired if jobs would be available if the hypothetical individual was late more than three times a month. (Tr. 49.) The VE replied that the individual may be able to work, as such a limitation was dependent upon the tolerance level of the employer. (Tr. 50.)

Candela's attorney asked the VE to consider the ALJ's original hypothetical and add the limitation – if the hypothetical individual was frequently distracted. (Tr. 51.) The VE defined frequently as two/thirds of a day, *id.*, and indicated that such an individual, even if distracted one-third of a day, would not be employable. (Tr. 51-52.)

### III. Standard for Disability

A claimant may be entitled to receive SSI benefits when he establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must also meet certain income and

7

resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity." Second, the claimant must suffer from a "severe impairment." A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. § 416.920(d). Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

## IV. Summary of Commissioner's Decision

The ALJ found Candela established medically determinable, severe impairments, due to borderline intellectual functioning ("BIF") and personality disorder; however, his impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. Candela was found incapable of performing his past work activities. He was determined to have a Residual Functional Capacity ("RFC") for a full range of work at all exertional levels, but with some nonexertional limitations. The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Candela is not disabled.

## V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision.");

8

*Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must consider whether the proper legal standard was applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with a sufficient basis to determine that the Commissioner applied the correct legal standards are grounds for reversal where such failure prejudices a claimant on the merits or deprives a claimant of a substantial right. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006).

## VI. Analysis

Candela claims the ALJ erred by: (1) ignoring evidence of his disability at all steps of the sequential analysis; and, (2) failing to include all nonexertional impairments in the hypothetical question and the RFC analysis (Doc. No. 17 at 10).

Candela's arguments focus on his nonexertional impairment of BIF (Listing 12.05), contending that the ALJ failed to consider critical educational and vocational evidence. (Doc.

9

No. 17 at 11.) Specifically, Candela claims that the ALJ ignored his school's Individual Education Plans ("IEPs"), the school psychologist's records, teachers' report, and vocational evaluations. He maintains that the ALJ's failure to consider this evidence is reversible error.

As the ALJ found Candela to have a severe impairment of BIF at step two of the analysis, the Court will begin its analysis at step three.

At step three, the burden of proof for establishing that an impairment meets or equals the requirements of a listing rests with the claimant. *See Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001). To meet a listed impairment, a claimant must satisfy all of the criteria in the listing. *See Roby v. Comm'r of Soc. Sec.*, 48 Fed. Appx. 532, 536 (6th Cir. 2002) (*citing Hale v. Sec'y of Health & Human Servs.*, 816 F.2d 1078, 1083 (6th Cir. 1987)).

Listing 12.05, 20 C.F.R. Pt. 404, Subpt. P, App. 1, states, in pertinent part:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C or D are satisfied.
>
> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded; **OR**
>
> B. A valid verbal, performance, or full scale IQ of 59 or less; **OR**
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation or function; **OR**
>
> D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
>
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.

Listing 12.08 Personality Disorders, 20 C.F.R. Pt. 404, Subpt. P, App. 1, states, in pertinent part:

> A personality disorder exists when personality traits are inflexible and

10

>maladaptive and cause either significant impairment in social or occupational functioning or subjective distress. Characteristic features are typical of the individual's long-term functioning are not limited to discrete episodes of illness.
>
>The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
>
>A. Deeply ingrained, maladaptive patterns of behavior associated with one of the following:
>
>>1. Seclusiveness or autistic thinking; or
>>2. Pathologically inappropriate suspiciousness or hostility; or
>>3. Oddities of thought, perception, speech and behavior; or
>>4. Persistent disturbances of mood or affect; or
>>5. Pathological dependence, passivity, or aggressivity; or
>>6. Intense and unstable interpersonal relationships and impulsive and damaging behavior;
>
>AND
>
>B. Resulting in at least two of the following:
>
>>1. Marked restriction of activities of daily living; or
>>2. Marked difficulties in maintaining social functioning; or
>>3. Marked difficulties in maintaining concentration, persistence, or pace; or
>>4. Repeated episodes of decompensation, each of extended duration.

"Sixth Circuit case law does not require a heightened articulation standard at step three of the sequential evaluation process." *See Marok v. Astrue,* 2010 WL 2294056, *3 (N.D. Ohio, Jun. 3, 2010) (*quoting Bledsoe v. Barnhart*, No. 04-4531, 165 Fed. Appx 408, 411 (6th Cir. Jan.31, 2006)) (*citing Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1986)). The regulations state that the ALJ should review all evidence of impairments to see if the sum of impairments is medically equivalent to a "listed impairment." 20 C.F.R. §§ 404.1526, 416.926. In order to conduct a meaningful review, the ALJ's written decision must make sufficiently clear the reasons for his decision. *Marok* at *3.

It is undisputed that Candela has severe impairments of BIF and personality disorder. The ALJ analyzed Listings 12.05 and 12.08 and determined that Candela did not meet or equal either. Candela argues, however, that the ALJ ignored evidence from school records that Candela's historical level of functioning demonstrates that he is markedly impaired in at least two Part B criteria set out in listing 12.05 – maintaining social functioning and maintaining

concentration, persistence and pace. (Doc. No. 17 at 13-14.) He relies on Halas' office notes dated January 30, 2006, indicating significant elevations on the Wiggens Content Scales of "manifest hostility and psychoticism" (Doc. No. 17 at 13, Tr. 277), as well as a 1999 vocational report and IEPs from 1990 through 2002 from Ashtabula Area City Schools. *Id*. The Commissioner argues that the ALJ is not required to discuss every piece of evidence, but especially this evidence as it does not pertain to the relevant period from December, 2005, through October, 2008. (Doc. No. 21 at 13.) Further, the Commissioner contends that, as to the listing argument, the completion of Form SSA 831-U5 is proof that a physician has considered the issue of equivalency. (Doc. No. 21 at 13, fn. 1.)

The Social Security regulations recognize the need for longitudinal evidence in mental impairment cases and that an individual's level of functioning may vary considerably over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1(D)(2). Since the level of functioning at any specific time may seem relatively adequate or, conversely, rather poor, proper evaluation of a claimant's mental impairments must take into account variations in levels of functioning in determining the severity of his impairments over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1(D)(2). "It is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication to establish [a claimant's] impairment severity." *Id*.

The regulations define concentration, persistence, or pace as "the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. Pt. 404, Subpt. P, App.12.00(A)(3). The regulations further provide that clinical examination or psychological testing can be used to assess major limitations in this area, and that such evidence, whenever possible should be supplemented by other available evidence. *Id*.

The completion of the Disability Determination and Transmittal Form (SSA 831) "ensures that consideration by a physician . . . designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review." (Doc. No. 18 at 8-9.) *See* SSR 96-6p at *3. The ALJ may rely upon such expert opinion to determine whether a claimant meets a listing requirement. *Id*.; *Curry v. Sec'y of*

12

*Health & Human Servs*., 1988 WL 89340 at *5 (6th Cir. Aug. 29, 1988) (*citing Fox v. Heckler*, 776 F.2d 738, 742 (7th Cir. 1985). Furthermore, even though not specifically mentioned by the ALJ, the vocational evaluation report dated November 30, 1999, as well as Candela's IEP reports dated from November 30, 1999, through December 5, 2000, were part of the record upon which the ALJ relied. *See* Exh. 15E and 16E. (Tr. 161-183.) In fact, at the hearing Candela's attorney directed the ALJ's attention to these exhibits. (Tr. 52.) An ALJ need not discuss every piece of evidence. *Walker v. Sec'y of Health & Human Servs*., 884 F.2d 241, 245 (6th Cir. 1989). Here, there was only one reference to Candela having a marked limitation in his ability to withstand stresses and pressures associated with most day-to-day work activities. (Tr. 288.)

Even considering the vocational evaluation and IEP reports, the ALJ, upon reviewing the evidence of record, did not determine that Candela was markedly limited in two areas. The ALJ examined the paragraph B (or D) criteria and concluded:

> In activities of daily living, the claimant has mild restriction. The claimant testified that he performs chores around the house daily, visits with friends, plays computer games and watches television. However, two doctors noted that he had difficulty with hygiene (Exhibit 4F, 10F and 7E).
>
> In social functioning, the claimant has moderate difficulties. The claimant lives with his mother and testified that he got along well with his friends. However, he also testified that he has difficulty working with supervisors and accepting criticism.
>
> With regard to concentration, persistence or pace, the claimant has moderate difficulties. Dr. Halas found the claimant may have difficulty dealing with the stresses and pressures of most day to day activities (Exhibits 4F and 5F).
>
> As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration.

(Tr. 18.) The ALJ concluded that the paragraph B or D criteria were not met as Candela's mental impairments did not cause at least two marked limitations. *Id*. The ALJ proceeded to analyze the other criteria in Listing 12.05 and concluded that Candela did not satisfy that criteria as Candela is able to take care of his personal needs and his verbal, performance, and full scale IQ scores are 78, 74, and 74, respectively. (Tr. 19.) The ALJ also discussed Candela's non-severe impairments of depressive disorder and drug and alcohol abuse, relying on Dr. Waddell's finding that Candela's impairments result in less than marked functional limitations. *Id*. The

13

ALJ concluded that Candela has "mild limitations of his activities of daily living; moderate difficulties in social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation, each of extended duration." *Id.* As there was no evidence that Candela met listing 12.05 or 12.08, his first assignment of error is overruled.

### Hypothetical Question

Next, Candela argues that the ALJ failed to include Candela's moderate nonexertional limitations in the hypothetical to the VE and in the RFC analysis. Specifically, he argues that the hypothetical did not adequately accommodate his moderate deficiencies in concentration, persistence, and pace. (Doc. No. 17 at 15.) The Commissioner maintains that the RFC incorporated the nonexertional limitations by referring to low stress work. (Doc. No. 21 at 15.)

A hypothetical question must precisely and comprehensively set forth every physical and mental impairment that the ALJ accepts as true and significant. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). In forming a hypothetical question to be posed to a vocational expert, the ALJ is required to incorporate only those limitations that he accepts as credible. *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 425, 429 (6th Cir. 2007) (*citing Casey v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir. 1993)). However, where the ALJ relies upon a hypothetical question that fails to adequately account for all of the claimant's limitations, it follows that a finding of disability is not based on substantial evidence. *See Newkirk v. Shalala*, 25 F.3d 316, 317 (6th Cir. 1994).

The Sixth Circuit has found that an omission of speed and pace-based restrictions from a hypothetical question is reversible error, and that restrictions to "simple" or "low stress" work do not sufficiently incorporate a claimant's medically established limitations. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516–17 (6th Cir. 2010) (citations omitted). In *Ealy*, the ALJ concluded that the claimant had moderate difficulties with regard to concentration, persistence or pace, but the ALJ failed to provide the vocational expert with a fair summary of those conclusions. *Id.* at 516. Instead, the ALJ only limited the claimant to simple, repetitive tasks and instructions. *Id.* The *Ealy* Court concluded that because the hypothetical inadequately described the claimant's limitations, the vocational expert's testimony did not constitute substantial evidence. *See also*

14

*Anderson v. Comm'r of Social Sec.,* 2011 WL 335059, at *10-11, fn. 6 (S.D. Ohio Jan. 4, 2011); *Whack v. Astrue*, 2008 WL 509210 at *8 (E.D. Pa. 2008) (citing cases for the proposition that hypothetical restrictions of "simple" or "low-stress" work do not sufficiently incorporate the claimant's medically established limitations where claimant has moderate deficiencies in concentration, persistence or pace).

Here, the state agency experts clearly found moderate limitations in concentration, persistence, and pace. As "highly qualified ... psychologists who are also experts in Social Security disability evaluation," their opinions must be considered by the ALJ. 20 C.F.R. § 416.927(f)(2)(i). The ALJ did consider and accept their opinions. However, the hypothetical of "low stress simple repetitive type tasks with no frequent interaction with coworkers or the general public" takes into consideration Candela's moderate limitations as to pace, by excluding fast-paced production position, but does not account for Candela's moderate limitations as to concentration and persistence (maintaining attention for long periods and being able to complete a normal work week). *See Ball v. Comm'r of Soc. Sec*., 2011 WL 765978, *4 (S.D. Ohio Feb. 25, 2011) ("low-stress" jobs defined as those that are "simple, routine and repetitive," and do not involve fast-paced production requirements.)

Under the *Ealy* ruling, the Court cannot find that the VE's testimony provides substantial evidence to carry the Commissioner's burden at Step Five. *See Frederick v. Comm'r of Soc. Sec.*, 2011 WL 1518966 (E.D. Mich. Mar. 25, 2011) ("The failure to account for concentrational deficiencies constitutes reversible error."); *Herriman v. Apfel*, 2000 WL 246598 (E.D. Mich. Feb. 11, 2000) (remanding case where ALJ's hypothetical failed to account for claimant's concentration deficiencies). In *Frederick*, the District Court for Eastern Michigan explained that "[t]he fact that a job is simple and unskilled has nothing to do with whether or to what degree a worker's moderate concentrational deficiencies will affect the timely completion of that job, and indeed, courts have found such descriptions insufficient to address deficiencies." 2011 WL 1518966 at *6 (*citing Newton v. Chater*, 92 F.3d 688, 695 (8th Cir. 1996)).

In the instant matter, because the ALJ gives no indication that he incorporated Candela's moderate mental limitations into the hypothetical or the RFC analysis, the Court finds that the

15

ALJ's determination is not supported by substantial evidence. Candela's second assignment of error is well-taken.

While the Court finds that the ALJ's decision fails to comply with the relevant legal standards, Candela can be awarded benefits only if proof of his disability is "compelling." *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994) (the court can reverse the Commissioner's decision and award benefits only if all essential factual issues have been resolved and proof of disability is compelling). When the ALJ misapplies the regulations or when there is not substantial evidence to support one of the ALJ's factual findings and his decision therefore must be reversed, the appropriate remedy is not to award benefits. The case can be remanded for further consideration.

The Court remands this matter for explanation and analysis in accordance with the cited federal regulations.

## VII. Decision

For the foregoing reasons, the Court finds the decision of the Commissioner not supported by substantial evidence. Accordingly, the decision of the Commissioner is vacated and the case is remanded, pursuant to 42 U.S.C. § 405(g) sentence four[2], for further proceedings consistent with this opinion.

IT IS SO ORDERED.

s/ Greg White
United States Magistrate Judge

Date: July 28, 2011

---

[2] Under sentence four of 42 U.S.C. § 405(g), the district court has the authority to reverse, modify, or affirm the decision of the Commissioner. This may include a remand of the case back to the Commissioner for further analysis and a new decision. A sentence four remand is a final judgment. *See Melkonyan v. Sullivan*, 501 U.S. 89, 97-102, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991).